O'NEILL PRODUCTION CREDIT ASSOCIATION, A CORPORATION, APPELLEE AND CROSS-APPELLANT, V. JOHN SCHNOOR ET AL., APPELLEES, AND GALYEN PETROLEUM COMPANY, A CORPORATION, INTERVENOR-APPELLANT AND CROSS-APPELLEE.

302 N.W.2d 376

Filed February 20, 1981.  No. 43247.

Arlen D. Magnuson for appellant.

Edward E. Hannon for appellee.

Heard before KRIVOSHA, C.J., McCOWN, CLINTON, BRODKEY, WHITE, and HASTINGS, JJ., and RONIN, District Judge.

KRIVOSHA, C.J.

The instant appeal presents to the court a question of first impression involving the issue of whether cattle may be included within the meaning of crops as set out in Neb. Rev. Stat. § 52-901 (Reissue 1978). If cattle are considered crops, we are further asked to decide whether a petroleum products lien has priority over a previously filed security agreement covering the same cattle.

The trial court found that cattle are included within the meaning of the word "crops," but that the petroleum products lien does not have priority over a properly filed financing statement. There are a number of circumstances involved in the instant case, including matters between O'Neill Production Credit Association (O'Neill), appellee, and the various parties involved in this action other than Galyen Petroleum Company (Galyen), the intervenor-appellant. However, due to the manner in which we decide the issue of whether cattle are included within the meaning of crops, we

need not concern ourselves with any of those other matters and can dispose of this appeal as a matter of law. For the reasons more particularly set out hereinafter, we find that cattle are not included within the definition of crops pursuant to the provisions of § 52-901 and, accordingly, reverse and remand the instant appeal with instructions to the trial court to enter an order consistent with this opinion.

It is uncontested that Galyen had, at various times, sold to David P. Mueller petroleum products for which Galyen claimed a petroleum products lien, though there was a dispute at trial as to whether all the products sold to Mueller entitled Galyen to a petroleum products lien. Again, because of the manner in which we dispose of this appeal, we need not resolve that dispute. The parties further acknowledge and concede that O'Neill had a valid security agreement superior to the rights of Galyen, unless Galyen had a petroleum products lien covering the cattle which was superior to O'Neill's lien.

Section 52-901 provides as follows: "Any person who furnishes gasoline, diesel fuel, tractor fuel, oil, grease, or other petroleum products to another to be used in farm machinery for power or lubricating purposes in the production of any agricultural crop shall be entitled to a lien upon *all such crops produced* and owned by the person to whom such fuel or lubricant had been furnished to secure the payment of the purchase price thereof, upon compliance with the provisions of sections 52-901 to 52-904." (Emphasis supplied.) While Galyen concedes that the petroleum was not sold for use in the cattle, it argues that the petroleum was sold for the purpose of operating a pivot irrigation system which watered grass which was fed to the cattle, thereby entitling Galyen to a petroleum products lien upon the cattle. Galyen conceded at oral argument that if cattle are not held to be crops within the meaning of the petroleum products lien law, Galyen does not have a lien upon the cattle and the question of the

priority between the petroleum products lien and the security agreement is not reached. The principal reason underlying that premise is that agricultural liens are wholly dependent upon statute or special contract, and no such lien was given at common law. Courts are not to add to the terms of the statute in determining who is entitled to benefit. See 3 Am. Jur. 2d *Agriculture* § 10 (1962).

Turning then to the specific question of whether cattle are included within the meaning of crops under the petroleum products lien, we first must direct our attention to the oft-cited and well-established rules of construction concerning the interpretation of statutes. In *Bachus v. Swanson*, 179 Neb. 1, 4, 136 N.W.2d 189, 192 (1965), we said: "A statute is not to be read as if open to construction as a matter of course. Where the words of a statute are plain, direct, and unambiguous, no interpretation is needed to ascertain the meaning. In the absence of anything to indicate the contrary, words must be given their ordinary meaning. It is not within the province of a court to read a meaning into a statute that is not warranted by the legislative language. Neither is it within the province of a court to read anything plain, direct, and unambiguous out of a statute."

Likewise, we have held that: "Generally speaking, a statute should be construed so that an ordinary person reading it would get from it the usual accepted meaning. Rules of interpretation are resorted to for the purpose of resolving an ambiguity, not of creating it." *State ex rel. Finigan v. Norfolk Live Stock Sales Co., Inc.*, 178 Neb. 87, 90, 132 N.W.2d 302, 304 (1964). See, also, *Peck v. Dunlevey*, 184 Neb. 812, 172 N.W.2d 613 (1969).

Our reading of the statute leaves us with the conclusion that there is no ambiguity contained within the provisions of § 52-901 which requires us to resort to any form of interpretation and we may, as the rules suggest, resort to the ordinary meaning of the word

"crops" to determine the scope of the word.

Neither party has cited to us any cases in which this question has been resolved, and we have found relatively few. In the case of *Ellis, McKinnon & Brown v. Hopps*, 30 Ga. App. 453, 454, 118 S.E. 583, 584 (1923), the Georgia Court of Appeals defined crops as follows: "[C]rops are the product of the soil and do not include the increase of live stock." Likewise, in the case of *State Mutual Ins. Co. v. Clevenger*, 17 Okla. 49, 50-51, 87 P. 583 (1906), the Oklahoma court defined crops as follows: "'The word "crop," in its general signification, means the product of cultivated plants while growing, or that product after it has been harvested or severed from the stalk or root to which it was attached.'"

Black's Law Dictionary 338 (5th ed. 1979) provides the ordinary meaning of crop to be: "Products of the soil, as are annually grown, raised, and harvested." The word "crops" is defined in 25 C.J.S. *Crops* § 1 (1966) as follows: "In general, the word 'crops' means all products of the soil that are grown and raised annually and gathered in a single season." Similar definitions of the word "crop" may be found in Words and Phrases. All of the authorities indicate that the word "crops" refers to the product of cultivated plants and not of livestock. Nothing which has been brought to our attention nor which we are able to discover ourselves could possibly lead one to believe that the word "crops" in its ordinary meaning encompasses cattle. There may be even some question as to whether the natural grasses eaten by the cattle involved in this case and watered by the pivot irrigation system are crops. The demurrer filed by O'Neill to Galyen's petition in intervention claiming a petroleum products lien on the cattle should have been sustained. For that reason, we reverse the judgment of the trial court and remand the matter back to the District Court with instructions to enter an order in accordance with this opinion.

REVERSED AND REMANDED WITH DIRECTIONS.